# Composite Exhibit B

| SUMMONS AND ORDER OF NOTICE | DOCKET NUMBER 1884CV01472 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: **Commonwealth of Massachusetts vs. DMB Financial LLC et al** | Michael Joseph Donovan, Clerk of Court |
|---|---|

| To: **Global Client Solutions LLC** | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |
|---|---|

To the above named defendant(s):

You are hereby summoned and required to serve upon:

**Benjamin Kyle Golden, Esq.**
**Massachusetts Attorney General's Office**
**One Ashburton Place**
**Boston, MA 02108**

RECEIVED
MAY 17 2018
By _____

an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

**Date:** 05/24/2018

**Time:** 02:00 PM

**Event:** Hearing on Preliminary Injunction

**Session Location:** Civil H / BOS-10th FL, CR 1015 (SC)

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED 05/14/2018 | CHIEF JUSTICE OF THE SUPERIOR COURT Witness: Hon. Judith Fabricant | ASSOCIATE JUSTICE Hon. Robert L Ullmann | ASSISTANT CLERK X STEVEN J. MASSE |
|---|---|---|---|

**RETURN OF SERVICE**

I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint.

PARTY NAME:

X

# CIVIL ACTION COVER SHEET

DOCKET NUMBER

### Trial Court of Massachusetts
### The Superior Court

| PLAINTIFF(S): Commonwealth of Massachusetts | COUNTY |
|---|---|
| ADDRESS: 1 Ashburton Place, Boston, MA 02108 | Suffolk |

DEFENDANT(S): DMB Financial, LLC and Global Client Solutions, LLC

| ATTORNEY: Benjamin Golden ; Max Weinstein | |
|---|---|
| ADDRESS: 1 Ashburton Place, Boston, MA 02108 | ADDRESS: 500 Cummings Center, Third Floor Beverly, MA 01915 and 4343 S 118th E Ave, Suite 220 Tulsa, OK 74146 |

BBO: #686119 ; #600982

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| AA1 | 93A action | A | ☑ YES ☐ NO |

*If "Other" please describe:

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ..................................................................................... $
2. Total doctor expenses ....................................................................................... $
3. Total chiropractic expenses .............................................................................. $
4. Total physical therapy expenses ....................................................................... $
5. Total other expenses (describe below) .............................................................. $
                                                                        Subtotal (A): $
B. Documented lost wages and compensation to date ......................................... $
C. Documented property damages to dated .......................................................... $
D. Reasonably anticipated future medical and hospital expenses ........................ $
E. Reasonably anticipated lost wages .................................................................. $
F. Other documented items of damages (describe below) .................................... $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

                                                                        TOTAL (A-F):$

### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

                                                                        TOTAL: $

Signature of Attorney/Pro Se Plaintiff: X                              Date:

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X                                    Date: 5/14/18

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION NO.

*18 - 1472 H*

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS | ) |
| Plaintiff, | ) |
| v. | ) |
| DMB FINANCIAL, LLC and GLOBAL CLIENT SOLUTIONS, LLC, | )  **COMPLAINT** |
| Defendants. | ) |

The Commonwealth of Massachusetts (the "Commonwealth"), by and through its

Attorney General, Maura Healey, brings this action in the public interest against DMB Financial,

LLC ("DMB") and its payment processor, Global Client Solutions, LLC ("Global") (together,

"Defendants"), for their numerous violations of the Massachusetts Consumer Protection Act,

G.L. c. 93A ("Chapter 93A").

## I.   INTRODUCTION

1. DMB offers a debt settlement program to financially distressed consumers who
are deep in debt and struggling to pay their creditors.

2. DMB tells consumers that the company's expert negotiators can settle their debts
for less than they owe.

3. DMB directs consumers who enroll to stop communicating with their creditors
and to stop paying their debts. DMB directs consumers instead to make monthly payments into
dedicated "savings" accounts established and maintained by Global. DMB promises to use the

funds that accumulate in the consumers' Global savings accounts to negotiate settlements of their debts.

4.   DMB claims that consumers who enroll in its debt settlement program can be "Debt free in 24-48 months" and that the program is affordable for consumers who enroll.

5.   DMB's claims are false. A large percentage of consumers who enroll in DMB's debt settlement program fail to complete it, and many consumers drop out of the program in worse financial condition than before they enrolled.

6.   The reality is that DMB enrolls consumers who it knows or should know are unlikely to complete or benefit from the program, and collects hundreds or thousands of dollars in fees in the process.

7.   Worse yet, many consumers who enroll in DMB's debt settlement program are sued by their creditors, and DMB engages in the unauthorized practice of law by providing advice and services that can and should only be provided by a competent, licensed attorney.

8.   Through this action, the Commonwealth seeks to permanently enjoin DMB from operating its debt settlement program in Massachusetts. The Commonwealth further seeks restitution for consumers harmed by Defendants' practices and civil penalties for their violations of Chapter 93A.

## JURISDICTION, AUTHORITY, AND VENUE

9.   This Court has jurisdiction over the subject matter of this action pursuant to G.L. c. 93A, § 4.

10.   This Court has personal jurisdiction over Defendants pursuant to G.L. c. 223A, § 3.

11.     Venue is proper in Suffolk County pursuant to G.L. c. 93A, § 4 and G.L. c. 223, § 5.

12.     The Commonwealth notified Defendants of its intent to bring this action at least five days prior to the commencement of this action, as required by G.L. c. 93A, § 4.

## II.     THE PARTIES

13.     Plaintiff is the Commonwealth of Massachusetts, represented by its Attorney General, Maura Healey.

14.     Defendant DMB Financial, LLC is a for-profit Massachusetts limited liability company with its usual and principal place of business at 500 Cummings Center, Third Floor, Beverly, MA 01915.

15.     Defendant Global Client Solutions, LLC is a for-profit Oklahoma limited liability company with its usual and principal place of business at 4343 S 118th E Ave, Suite 220, Tulsa, Oklahoma 74146. Global is not registered to do business in the Commonwealth.

## III.     DMB'S DEBT SETTLEMENT PROGRAM

16.     DMB is a Massachusetts-based company that promises to renegotiate and settle the unsecured debts of financially distressed consumers who are struggling to pay their creditors.

17.     DMB offers its debt settlement program to consumers in Massachusetts and at least 23 other States.

18.     DMB claims to have served over 30,000 consumers nationwide, including thousands of Massachusetts residents.

19.     DMB is not professionally licensed by any Massachusetts state agency.

### Sales & Advertising

20.     DMB's debt settlement program is sold by DMB and by outside companies that DMB refers to as third-party affiliates. DMB pays the affiliates between $250 and $500 for referring each consumer who enrolls in its debt settlement program and makes at least one payment into the consumer's Global savings account.

21.     DMB's sales staff are "expected to enroll a minimum amount of clients and a minimum amount of debt on a monthly basis."

22.     DMB advertises its debt settlement program on its website.

23.     DMB's current website, www.dmbfinancial.com, prominently displays the following two graphics:



24.     The website also includes graphic illustrations of recent settlements that DMB has purportedly negotiated with creditors, including, for example, the following graphic:



4

25.     The website tells consumers that "DMB has helped more than 30,000 people just like you resolve their burdensome debt. We work directly with your creditors in your behalf to restructure how much you owe and the timeframe in which you have to pay it—all within a monthly budget you can afford."

26.     The website encourages consumers to "[m]ake the smart financial decision and restructure your debt based on terms you can afford and pay less than what you currently owe. By completing our program, you could save thousands of dollars and be debt free sooner than you ever thought possible. **Now that's a plan!**"

27.     The website does not disclose DMB's fees or any of the negative financial consequences of enrolling in DMB's debt settlement program.

28.     DMB substantially altered its website in 2016 after receiving a civil investigative demand from the Attorney General.

29.     The prior version of DMB's website included the following representations about DMB's ability to reduce and eliminate consumers' debts:

- "We negotiate directly with your creditors to get them to forgive a portion of the debt that you owe. **Our programs are designed to have you out of debt anywhere from 12-36 months**";

- "As a matter of fact, our typical client has seen over 50% of their unsecured debt negotiated away and is debt free in as little as 36 months.*";[1]

- "Debt settlement provides an alternative to bankruptcy";

---

[1] The asterisk directed consumers to read the following text in approximately eight-point font:

*Individual results may vary based on ability to save funds, amount of debt, willingness of creditors to negotiate, and the successful completion of all program terms. DMB's fees not included in savings disclosure. Program does not assume or pay any debts, nor provide legal or tax advice. Prudence should always be taken by consumers when reviewing contracts and disclosure materials. DMB's services not available in all states.

- "Most people are skeptical this approach is possible. But if you have a professional debt negotiator on your team, the odds are very good that he or she can cut your debt in HALF or less"; and

- "We are so confident in our ability to settle your debts that we guarantee it!"

30.     The prior version of DMB's website discouraged consumers from attempting to settle their own debts:

- "We're professionals, but if one of us every got into a financial pickle, we'd never try to negotiate our own debts. Instead, we'd hire one of our colleagues to do the job for us. We can't emphasize this enough. Just having a third-party professional on your team makes all the difference in the world. There is something almost magical about this simple approach. Once the banks realize that they are talking to a professional, someone who knows the rules and regulations, and then they quickly change their tune";

- "A negotiator will obtain better results than you could ever obtain on your own, simply because all of the bank's tactics are stymied by the fact that they can't talk directly to you"; and

- "The majority of clients who leave a debt settlement program rarely succeed in solving their debt problems on their own, and remain mired in debt for many years to come."

31.     The prior version of DMB's website also stated or implied that consumers who enroll in DMB's debt settlement program would improve their credit:

- "DMB doesn't offer any quick fixes or 'get rich quick' schemes, but something priceless: the power to improve your credit and build a healthy financial future";

- "Empower yourself by learning more about credit, debt settlement, and using credit responsibly"; and

- "If you're thinking of dealing with banks directly . . . your credit score . . . [is] likely to drop another 70 to 130 points!"

**Sales Call**

32.     DMB's website directs interested consumers to call a toll-free telephone number "for a FREE, no obligation consultation."

6

33.     DMB tells the consumer that they will work together to "outline a budget" that will enable the consumer to repay his or her "outstanding debt in possibly as little as 24-48 months."

34.     DMB asks the consumer to make a complete disclosure of the consumer's financial affairs, including the consumer's total income and assets, total indebtedness, typical monthly expenses, current employment status, and any "hardship" the consumer may be suffering.

35.     DMB uses this information to calculate the length of the consumer's debt settlement program and the program's monthly payment amount. The average length of the program is 42 months. The average amount of the monthly payment is hundreds or thousands of dollars.

36.     DMB does not verify the balances of consumers' debts at the time of enrollment, but rather requests that consumers provide it with the "actual creditor statements" after they enroll.

37.     DMB routinely tells consumers that they will not be sued and that their credit will not suffer as a result of enrolling in its program.

38.     DMB has developed scripted rebuttals to consumers' frequently asked questions.

39.     If the consumer expresses concern that DMB's debt settlement program "sounds too good to be true," DMB tells the consumer that "[b]ased on your unique situation we believe that this is the program that best fits your budget and your financial situation."

40.     If the consumer asks if he or she may "do this on my own?," DMB responds that "[y]ou could theoretically do any number of things on your own: Represent yourself in court, file your own tax return or fix a leaky faucet. Or, you can hire a professional in that field to make

certain the job is *done right*. Since this is your financial future we're talking about, there's real comfort in that." (emphasis in original).

41.     If a consumer asks if he or she may be sued by a creditor, DMB tells the consumer that collection lawsuits are rare and that "even if you do face legal collections we have a team that can settle that account, no matter the status." DMB explains that its "litigation team" can either "get a settlement done" or "set up a monthly payment arrangement with the firm on the full balance."

42.     If a consumer asks "How much are your fees?," DMB tells the consumer that its fees "shouldn't be a concern" because they are included in the consumer's monthly payment. DMB next tells the consumer that it "will not charge you ANYTHING until we actually settle your debt. So you don't pay ANY fees until you get results, period!" DMB then explains that while its fee is "25% of your TOTAL debt," that "works out to be about 6% per year, much lower than what you are probably paying right now, and we settle your debts for less than what you owe, that's a great net savings for you!"

43.     At no point before enrollment does DMB tell consumers the amount of money or the percentage of each outstanding debt they must save before DMB will make bona fide settlement offers to their creditors.

**Financial Condition of Consumers**

44.     DMB does not meaningfully consider the ability of consumers to complete or benefit from its debt settlement program at the time of their enrollment.

45.     The average consumer who enrolls in DMB's debt settlement program has tens of thousands of dollars of debt – some have more than $100,000 in debt – and zero dollars in savings.

46.     DMB frequently enrolls consumers on the basis of unrealistic budgets that allocate $0 per month to basic necessities, including food, utilities, clothing, laundry, and personal care.

47.     DMB knowingly and regularly enrolls consumers whose total income is less than their necessary expenses, or whose total income is insufficient to pay both their necessary expenses and for DMB's program.

48.     Many consumers who enroll in DMB's debt settlement program are unemployed or underemployed, elderly, sick, or disabled, and/or living on a limited or fixed income.

49.     DMB's debt settlement program is unaffordable for many consumers who enroll.

**Enrollment Documents**

50.     If a consumer is approved for enrollment, DMB sends the consumer a series of documents to sign, including separate contracts with DMB and Global.

51.     The contract with DMB is a three-page document that includes sixteen (16) single-spaced paragraphs in approximately eight-point font. The front page of the contract includes (1) the estimated length of the consumer's debt settlement program, (2) the monthly program payment, and (3) the total amount of the consumer's enrolled debt.

52.     The consumer grants DMB "full power and authority" to "perform each and every act which may be necessary in connection with the attempted mediation, negotiation, and settlement" of the consumer's debts.

53.     The consumer agrees "to forward all communications received from creditors directly" to DMB.

54.     The contract does not disclose DMB's total fee, but instead typically describes its "Fee Structure" as a "Per settlement fee of 25% of debt balance as determined at time of enrollment."

55.     The contract typically states that DMB will not collect its settlement fee until the consumer has given his or her "express consent and approval."

56.     The contract states that DMB will "attempt to negotiate and settle" the consumer's debts after the consumer has "saved sufficient funds" to allow DMB to make "meaningful settlement offers" to his or her creditors.

57.     The contract does not disclose, or does not clearly and conspicuously disclose, the harms that consumers may suffer by enrolling in DMB's debt settlement program, including that their creditworthiness is likely to be impaired, that the size of their debts may increase because of the accrual of interest and fees, and that they may be used by creditors and debt collectors.

58.     The consumer's contract with Global authorizes Global (1) to establish a savings account for the consumer, (2) to deposit funds from the consumer's primary bank account into the Global savings account, and (3) to distribute funds from the Global savings account to pay the consumer's creditors.

59.     The consumer's contract with Global does not authorize Global to distribute funds from the consumer's Global savings account to pay DMB's settlement fees.

60.     In exchange for its services, Global charges the consumer an account setup fee of $9.00 and a monthly service charge of $9.85, as well as an assortment of other fees and charges.

**Post-Enrollment Communications**

61.     Following a consumer's enrollment into its debt settlement program, DMB works to build a relationship of "trust and confidence" with the consumer.

10

62.     The first communication from DMB to the consumer is an "automatic email" that "congratulates" the consumer on having "taken the first step toward becoming debt free!" The email tells the consumer that DMB (1) is "honored by the trust you have placed in us and promise[s] to work diligently on your behalf!"; (2) is "confident that when all your debt is settled, you will look back and wonder why you did not enroll into our program sooner"; and (3) has "a proven methodology for addressing all of your debt with one goal in mind – to get you out of debt as quickly as it possible."

63.     DMB next mails the consumer a packet of materials that includes information about "Dealing with Collection Calls," a "Collection Call Phone Script," and letters with the terms of settlements purportedly negotiated by DMB. At the bottom of each letter is a graphic that shows the alleged "Original Balance," Settlement Amount," and "Client Savings." The packet contains no information about DMB's fees.

64.     DMB proceeds to communicate with the consumer through a series of scripted telephone calls. In a 24-hour call, DMB tells the consumer that it is DMB's "intention to get you out of debt in the shortest amount of time possible." In a call made 7 days after the consumer's enrollment, DMB implores the consumer "to be strong and resolute in your ability to ignore the creditor calls" and "to avoid speaking with the collectors." In a 14-day call, DMB tells the consumer that DMB understands "that dealing with these financial issues can be daunting; however, you can rest easy that we will be working diligently to eliminate your debt." In a 21-day call, DMB informs the consumer of "the initial plan of which creditor" DMB thinks will "settle first and why." In a 28-day call, DMB tells the consumer "to ignore all calls from the collectors" because "[t]heir only intention is to frighten you into making a minimum payment to them. The best thing is to JUST NOT TALK TO THEM! This is probably the most difficult part

of the program but part of the normal process. Just keep in mind how much money you will be saving, it will make it all worth the trouble."

65.    DMB tells the consumer that it is "crucial to the success of your program that you have as little contact with your creditors as possible."

66.    DMB advises the consumer to change his or her physical mailing address and phone number to DMB's physical mailing address and phone number.

**Authorization for Settlements**

67.    DMB negotiates with creditors individually and usually begins to negotiate with a particular creditor after the consumer has saved enough money to pay DMB's settlement fee and the savings are not needed to pay for any previously-negotiated settlements.

68.    When DMB reaches a settlement with a creditor, the creditor sends DMB a letter that includes the current balance of the debt, the settlement amount (the amount the consumer must pay the creditor), the number of payments the consumer must make to the creditor, the amount of each payment, and the date of each payment. The letter does not disclose DMB's settlement fee. The consumer does not sign the letter or any other document memorializing the terms of the settlement.

69.    A settlement may require the consumer to make a lump-sum payment to the creditor or, more commonly, to make multiple payments to the creditor over a period of months or years.

70.    The creditor usually is not required to forgive any portion of the consumer's debt until the consumer makes all required payments under the terms of the settlement.

71.    After receiving a letter from a creditor proposing a settlement, DMB attempts to obtain the consumer's "verbal authorization" over the telephone.

72.     Global distributes DMB's settlement fees to DMB based on instructions received from DMB.

73.     DMB does not always obtain the consumer's authorization for Global to distribute DMB's settlement fee to DMB.

### Debt Collection Lawsuits

74.     DMB tells the consumer who asks that debt collection lawsuits are rare and that "even if you do face legal collections we have a team that can settle that account, no matter the status." DMB tells the consumer that its "litigation team" can either "get a settlement done" or "set up a monthly payment arrangement with the firm on the full balance."

75.     DMB tells the consumer that it is "not looking to get any one sued" and that "creditors would rather settle than sue you for your debt" because it is "expensive and there is a low probability of the debt being collected in full."

76.     In practice, many consumers who enroll in DMB's debt settlement program are sued for nonpayment of their debts – and some are sued more than once.

77.     DMB is not a law firm, does not employ licensed attorneys, and does not have the legal training or ability to advise consumers properly about responding to debt collection lawsuits.

78.     DMB typically responds to debt collection lawsuits by calling the plaintiff creditor's law firms to inquire on what terms the plaintiffs will agree to settle the debts.

79.     Unlike a competent, licensed attorney, DMB does not advise consumers as to strength of the plaintiff creditor's claims, the consumers' possible defenses or counterclaims, or whether the consumers would be better served by filing for bankruptcy instead of entering into a settlement.

80.    In most cases, DMB does nothing more than ask consumers to come up with "additional funds" before a "specially trained litigation employee" (also known as a "Litigation Specialist") attempts to negotiate settlements with the plaintiff creditors' law firms that will result in additional fees for DMB.

**DMB's Settlement Fees**

81.    For each settlement it negotiates, DMB requests and receives a settlement fee that Global distributes directly from the consumer's Global savings account to DMB.

82.    DMB does not always request the consumer's authorization before taking its settlement fee.

83.    In violation of its contract with the consumer, DMB typically requests and receives a settlement fee equal to 25% of the debt at the time of settlement, rather than at the time of enrollment. This practice often has the effect of increasing DMB's settlement fee because, as a result of DMB's directions that consumers stop paying their creditors, the size of a debt usually increases between the time of enrollment and settlement. In some cases, the debt increases so much that the consumer pays the creditor more than the consumer owed at the time of the consumer's enrollment in DMB's debt settlement program.

84.    In many cases, DMB requests and receives its settlement fee (or a portion thereof) before or just after the consumer makes his or her first payment to the creditor pursuant to the settlement.

85.    For settlements that require the consumer to make more than one payment to the creditor, DMB often requests and receives its settlement fee (or a portion thereof) before the consumer completes making all required payments to the creditor.

86.     The consumer's payment of DMB's settlement fee frequently depletes the consumer's Global savings account of nearly all the money that the consumer had saved to pay off his or her debts.

87.     DMB collects its settlement fees regardless of whether the consumer becomes debt free or any debt is forgiven.

### Examples of Consumer Experiences

88.     Based on the information DMB collects from consumers at the time of their enrollment, DMB knows or should know that many of the consumers who enroll in its debt settlement program are unlikely to complete or benefit from the program.

89.     The following examples illustrate the experiences of consumers who have enrolled in DMB's debt settlement program.

**Example 1**

90.     A consumer enrolled in DMB's debt settlement program in September 2012.

91.     At the time of his enrollment, the consumer had three debts totaling almost $45,000.

92.     The consumer agreed to deposit $634 per month for 60 months into a Global savings account.

93.     In May 2013, DMB settled the consumer's first debt. Pursuant to the terms of the settlement, the consumer was required to make seventeen (17) monthly payments to his creditor. DMB obtained its full settlement fee from Global after the consumer had made only the first payment to the creditor. The consumer had $0 in his Global savings account after paying DMB's settlement fee.

15

94.     In June 2013, DMB settled the consumer's second debt. This time, DMB structured the settlement to require the consumer to make twenty-four (24) monthly payments to the creditor.

95.     In August 2014, the consumer's third debt was placed with a law firm for collection.

96.     In February 2015, the consumer informed DMB that he had been served with a summons regarding the third debt. DMB advised the consumer that his funds were "tied up." When the consumer said that he might be able to borrow money from his family, DMB responded that it would "contact the LO [Law Office] asap and be in contact with him."

97.     DMB proceeded to offer the law firm "9348 over 24 pays of 389.50" to settle the debt.

98.     In March 2015, the consumer told DMB that he was dropping out of his debt settlement program because he had "hit rock bottom," was "seeing a doctor for anxiety," and was filing for bankruptcy because it was the "only option he c[ould] move forward with."

**Example 2**

99.     A consumer enrolled in DMB's debt settlement program in September 2015 because she was struggling to make payments to her creditors.

100.     DMB recorded that the consumer had income of $1,000 per month and that her monthly living expenses totaled $700.

101.     As part of her debt settlement program, the consumer agreed to deposit $735.15 per months for 48 months into a Global savings account.

102.     The $735.15 monthly deposit was more than double the $300 than the consumer had left over each month after paying her necessary living expenses.

103.    In March 2016, the consumer called DMB and they "discussed credit mac program to help her with credit score at the end of our program." Credit Mac is a self-described "credit restoration company" that promises to delete or otherwise remove negative items from a consumer's credit report.

104.    In April 2016, DMB negotiated a settlement of the consumer's first debt and requested and received from Global a settlement fee equal to 25% of the amount of the debt at the time of settlement.

105.    In May 2016, DMB settled the consumer's second debt. The settlement required the consumer to make twenty (20) monthly payments to her creditor. DMB obtained a settlement fee of $2,500 from Global prior to the consumer making her first payment to the creditor.

106.    One month later, in June 2016, the consumer dropped out of her debt settlement program and filed for Chapter 7 bankruptcy, reporting in her bankruptcy filing that she was unemployed and that her sole source of income was $865 per month in social security income benefits.

107.    At the time she dropped out of her debt settlement program, the consumer had paid almost 80% of the money that she had deposited into her Global savings account to DMB; had paid approximately three times more in fees to DMB than she had paid to her creditors; and her total debt had increased by more than $3,000.

**Example 3**

108.    A consumer enrolled in DMB's debt settlement program in October 2015 because a "work slow down [sic] and kids [sic] educational expenses made it difficult to keep up on payments."

109.    The consumer agreed to deposit $541.06 per month for 48 months into a Global savings account.

110.    According to DMB's records, in November 2015, the consumer complained to DMB that she had been told that "all settlements" would be "setup [sic] in 90 days" and that "she felt lied too [sic]."

111.    In December 2015, DMB attempted to settle one of the consumer's debts, but was told the debt could not be settled because the account was "only 14 days past due."

112.    The consumer was sued three times while enrolled in her debt settlement program – twice by the debt collection law firm Lustig, Glaser & Wilson, P.C. ("Lustig") and once by the debt collection law firm Zwicker & Associates, P.C. ("Zwicker").

113.    Lustig filed the first lawsuit in June 2016. In response to Lustig's offer to dismiss the lawsuit for $1,200, DMB offered to settle the debt for $1,100. After Lustig refused, the consumer paid Lustig the $1,200 that Lustig had previously demanded. Nevertheless, a default judgment entered against the consumer because she had failed to appear at thehearing for the case.

114.    Lustig filed the second lawsuit in August 2016. In response, DMB and Lustig negotiated a settlement that required the consumer to make eight (8) monthly payments to the creditor. Despite making all eight (8) payments, a judgment subsequently entered against the consumer for failing to respond to interrogatories.

115.    The third lawsuit was filed by Zwicker on August 2016. In response to the lawsuit, DMB and Zwicker negotiated a settlement that required the consumer to make a single payment lump-sum payment. The consumer did not have funds in her Global savings account to pay for this settlement, and thus had to deposit additional funds into her Global savings account.

## VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT

116.    The Massachusetts Consumer Protection Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." G.L. c. 93A, § 2(a).

117.    Whether an act or practice is unfair largely depends "on the nature of [the] challenged conduct and on the purpose and effect of that conduct." *Massachusetts Employee Ins. Exch. v. Propac-Mass, Inc.*, 420 Mass. 39, 42-43 (1995) (describing these as the "crucial factors"). Courts traditionally assess (1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen). See *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

118.    An act or practice is "deceptive" if it has the "capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." *Aspinall v. Phillip Morris Companies, Inc.*, 442 Mass. 381, 394 (2004).

### COUNT 1

119.    The foregoing paragraphs are re-alleged and incorporated herein by reference.

120.    By carrying out the scheme described above, DMB has engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, § 2(a).

121.    These unfair and deceptive acts and practices include, but are not limited to, the following:

> A. Making false, misleading, and unsubstantiated claims about DMB's ability to reduce, settle, and eliminate a consumer's debts;

19

B. Representing, directly or by implication, that enrollment in DMB's debt settlement program will improve a consumer's creditworthiness;

C. Failing to inform prospective enrollees of the large percentage of enrolled consumers who fail to complete or benefit from DMB's debt settlement program;

D. Failing to inform consumers of the time by which DMB will make a bona fide settlement offer to each of a consumer's creditors;

E. Failing to inform consumers of the amount of money or the percentage of each outstanding debt that the consumer will need to accumulate before DMB will make a bona fide settlement offer to each of the consumer's creditors;

F. Failing to adequately disclose the harms that consumers suffer by enrolling in DMB's debt settlement program;

G. Failing to meaningfully consider consumers' ability to complete or benefit from DMB's debt settlement program at the time of their enrollment;

H. Enrolling consumers in DMB's debt settlement program who DMB knew or should have known were unlikely to complete the program;

I. Directing consumers to stop communicating with and making payments to their creditors;

J. Requesting and receiving settlement fees without obtaining consumers' authorization;

K. Requesting and receiving settlement fees based on the amount of debts at the time of settlement rather than the time of consumers' enrollment in DMB's debt settlement program;

    L.  Requesting and receiving settlement fees prior to consumers making a first

         payment to creditors pursuant to settlements negotiated by DMB;

    M.  Requesting and receiving settlement fees regardless of whether consumers

         achieve any reduction in debt pursuant to a settlement negotiated by DMB;

    N.  Advising consumers who have been sued for nonpayment of their debts; and

    O.  Negotiating settlements with the creditors of consumers who have been sued

         for nonpayment of their debts.

122.    DMB knew or should have known that these unfair and deceptive acts and

practices violate G.L. c. 93A, § 2(a).

## COUNT 2

123.    The foregoing paragraphs are re-alleged and incorporated herein by reference.

124.    General laws c. 221, § 46C, provides that "[t]he furnishing of advice or services

for and in behalf of a debtor in connection with any debt pooling plan, whereby such debtor

deposits any funds for the purposes of making pro rata payments or other distributions to his

creditors, shall be deemed to be the practice of law."

125.    Here, DMB engages in the practice of law in violation G.L. c. 221, §§ 46 and

46C, by furnishing advice and services in connection with a program whereby consumers deposit

funds for the purpose of making distributions of the funds to their creditors. See *Home Budget

Service, Inc. v. Boston Bar Ass'n*, 335 Mass. 228, 233 (1957); see also *In the Matter of Hrones*,

457 Mass. 844, 849-850 (2010), quoting *Matter of an Application for Admission to the Bar of the

Commonwealth*, 443 Mass. 1010, 1012 n.4 (2005) (at a minimum, "the practice of law includes:

"directing and managing the enforcement of legal claims and the establishment of the legal rights

of others, where it is necessary to form and to act upon opinions as to what those rights are and

as to the legal methods which must be adopted to enforce them, the practice of giving or furnishing legal advice as to such rights and methods and the practice, as an occupation, of drafting documents by which such rights are created, modified, surrendered or secured").

126. DMB knew or should have known that furnishing advice or services in connection with such a program violates G.L. c. 93A, § 2(a).

## COUNT 3

127. The foregoing paragraphs are re-alleged and incorporated herein by reference.

128. Global has engaged in unfair and deceptive acts and practices in violation of G.L. c. 93A, § 2(a) by, among other things, (1) distributing settlement fees to DMB without obtaining authorization from consumers; (2) distributing settlement fees to DMB in advance of consumers having made at least one payment pursuant to settlements negotiated by DMB; and (3) distributing settlement fees to DMB based on the amounts of consumers' debts at the time of settlement rather than enrollment.

129. Through these unfair and deceptive acts and practices, Global provided substantial assistance or support to DMB when Global knew or consciously avoided knowing of each of the unfair and deceptive acts and practices described in Counts 1 and 2.

130. Global knew or should have known that each of these acts and practices violate G.L. c. 93A, § 2(a).

## RELIEF REQUESTED

WHEREFORE, the Commonwealth requests that this Court enter judgment against Defendants and:

1. Permanently enjoin Defendants from furnishing advice or services in connection with DMB's debt settlement program;

22

2. Order Defendants to refund to consumers all fees consumers paid DMB and Global in connection with DMB's debt settlement program, including all settlement fees collected by DMB;

3. Order Defendants to refund to consumers all money consumers paid creditors pursuant to settlements negotiated by DMB that did not result in forgiveness of debt;

4. Order Defendants to pay civil penalties of $5,000 per violation of G.L. c. 93A, § 2(a);

5. Order Defendants to pay the Commonwealth's attorneys' fees and all costs incurred in connection with the investigation and litigation of this action; and

6. Award additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

SUFFOLK, ss.   SUPERIOR COURT DEPT.
(date) 5/14/18
Notice ordered issued hereon returnable
at the H SESSION, CT. RM. 1015
on 5/24/18 at 2:00 p.m.
to show cause why a preliminary
injunction
should not issue
By the Court, (ULLMAN, J.)
ATTEST:
STEVEN J. MASSE
Assistant Clerk

Benjamin Golden (BBO #686119)
Assistant Attorney General
Max Weinstein (BBO #600982)
Chief, Consumer Protection Division
One Ashburton Place
Boston, MA 02108
Telephone (Golden): (617) 963-2661
Telephone (Weinstein): (617) 963-2499
Email: Benjamin.Golden@state.ma.us
Email: Max.Weinstein@state.ma.us

Date: May 14, 2018

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                               OF THE TRIAL COURT

COMMONWEALTH OF MASSACHUSETTS,

                              Plaintiff,

v.

DMB FINANCIAL, LLC,                            Civil Action No. *18-1472 H*

                              Defendant.

## COMMONWEALTH'S MOTION FOR PRELIMINARY INJUNCTION

The Commonwealth of Massachusetts (the "Commonwealth"), by and through its

Attorney General, Maura Healey, moves pursuant to Massachusetts Rule of Civil Procedure

65(a) and G.L. c. 93A, § 4, for a preliminary injunction against DMB Financial, LLC, consistent

with the terms of the proposed Preliminary Injunction, attached as **Exhibit 1,** for the reasons set

forth in the Commonwealth's contemporaneously filed supporting memorandum of law.

[Signature Block on Next Page]



RECEIVED

MAY 1 4 2018

SUPERIOR COURT-CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

Respectfully Submitted,

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

_____
Benjamin Golden (BBO #686119)
Assistant Attorney General
Max Weinstein (BBO #600982)
Chief, Consumer Protection Division
One Ashburton Place
Boston, MA 02108
Telephone (Golden): (617) 963-2661
Telephone (Weinstein): (617) 963-2499
Email: Benjamin.Golden@state.ma.us
Email: Max.Weinstein@state.ma.us

Date: May 14, 2018

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                               OF THE TRIAL COURT

---

COMMONWEALTH OF MASSACHUSETTS,

                        Plaintiff,

v.

DMB FINANCIAL, LLC,                                        Civil Action No. _____

                        Defendant.

---

## [PROPOSED] PRELIMINARY INJUNCTION

It is hereby **ORDERED** that DMB Financial, LLC and their agents, employees, attorneys, associates, officers, affiliates and all other persons acting in concert with them, are hereby enjoined from engaging in the following conduct in the Commonwealth of Massachusetts or in connection with a Massachusetts consumer:

    A.    Making false, deceptive, misleading, and unsubstantiated representations to consumers related DMB's ability to settle consumers' debts, including but not limited to representations related to:

        1.  the amount of money consumers may save by enrolling in DMB's debt settlement program;

        2.  the amount of time in which consumers can expect to become "debt free"; and

        3.  DMB's ability to assist consumers who are sued for nonpayment of their debts.

B.  Enrolling consumers in DMB's debt settlement program whose total income is less than their necessary expenses, or whose income is insufficient to pay both their necessary expenses and for DMB's program;

C.  Enrolling consumers in DMB's debt settlement program based on budgets that fail to allocate sufficient income to pay for necessary living expenses, including food, shelter, utilities, clothing, medical care, and laundry;

D.  Failing to make truthful and clear and conspicuous disclosures of the following information before enrolling consumers in its debt settlement program:

1. The percentage of consumers who fail to complete DMB's debt settlement program;

2. The harms that consumers may suffer by enrolling in DMB's debt settlement program, including that consumers' creditworthiness is likely to suffer, that consumers' debts may increase, and that consumers may be sued for nonpayment of their debts;

3. DMB's total fee; and

4. The total cost to complete DMB's settlement program, including all fees charged by DMB and Global, and all payments that the consumers are expected to make towards their creditors.

E.  Directing consumers to stop communicating with or making payments to their creditors;

F.  Failing to inform prospective enrollees of the time by which DMB will make a bona fide settlement offer to each of the consumer's creditors;

G.    Failing to inform prospective enrollees of the amount of money or the percentage of each outstanding debt that the consumer will need to accumulate before DMB will make a bona fide settlement offer to each of the consumer's creditors;

H.    Requesting or receiving settlement fees without obtaining consumers' express informed consent;

I.    Requesting or receiving settlements fees based on the amounts of a consumer's debts at the time of the consumer's enrollment in DMB's debt settlement program;

J.    Requesting or receiving settlement fees before the consumer makes at least one payment pursuant to the settlement;

K.    Requesting or receiving settlement fees unless DMB reasonably believes that the consumer will be able to make all subsequent payments in accordance with the terms of a settlement;

L.    Advising consumers who have been sued for nonpayment of their debts; and

M.    Negotiating settlements with the creditors of consumers who have been sued for nonpayment of their debts.

**SO ORDERED**

Entered:_____          _____

                                        Justice of the Superior Court

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                              SUPERIOR COURT DEPARTMENT
                                         OF THE TRIAL COURT

COMMONWEALTH OF MASSACHUSETTS,

                         Plaintiff,

v.

DMB FINANCIAL, LLC,                      Civil Action No. _____

                         Defendant.

### EX PARTE MOTION FOR A SHORT ORDER OF NOTICE

Pursuant to G.L c. 93A, § 4, Mass. R. Civ. P. 65(b), and Superior Court Rule 9(A)(e)(1),

the Commonwealth of Massachusetts ("Commonwealth"), by and through Attorney General

Maura Healey, respectfully requests that this Court issue a short order of notice to Defendant

DMB Financial, LLC ("DMB"), requiring it to appear and show cause as to why a preliminary

injunction should not issue consistent with the terms of the proposed Preliminary Injunction

submitted herewith. The Commonwealth request this short of notice to prevent DMB from

continuing to engage in unfair and deceptive conduct in violation of G.L. c. 93A, § 2(a), and to

promote the public interest.



[Signature Block on Next Page]

Respectfully Submitted,

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

Benjamin Golden (BBO #686119)
Assistant Attorney General
Max Weinstein (BBO #600982)
Chief, Consumer Protection Division
One Ashburton Place
Boston, MA 02108
Telephone (Golden): (617) 963-2661
Telephone (Weinstein): (617) 963-2499
Email: Benjamin.Golden@state.ma.us
Email: Max.Weinstein@state.ma.us

Date: May 14, 2018

NOTIFY

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT DEPARTMENT
                                               OF THE TRIAL COURT

COMMONWEALTH OF MASSACHUSETTS,

                    Plaintiff,

v.

DMB FINANCIAL, LLC and GLOBAL CLIENT          Civil Action No. ___18.1472.17___
SOLUTIONS, LLC,

                    Defendants.

**COMMONWEALTH'S MOTION TO APPOINT SPECIAL PROCESS SERVER**

Plaintiff, the Commonwealth of Massachusetts, hereby moves this honorable Court to

appoint Kevin McCarthy, Director of Civil Investigations, Office of the Attorney General, One

Ashburton Place, Boston, MA, 02108, or his designee, as special process server in the

action captioned above.

[Signature Block on Next Page]

Respectfully Submitted,

COMMONWEALTH OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

Benjamin Golden (BBO #686119)
Assistant Attorney General
Max Weinstein (BBO #600982)
Chief, Consumer Protection Division
One Ashburton Place
Boston, MA 02108
Telephone (Golden): (617) 963-2661
Telephone (Weinstein): (617) 963-2499
Email: Benjamin.Golden@state.ma.us
Email: Max.Weinstein@state.ma.us

Date: May 14, 2018